# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

DEC 1 1 2007 *for C'Ville*

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

|  |  |
|---|---|
| WILLIAM VERRINDER, <br> *Plaintiff,* | CIVIL NO. 3:06CV00024 |
| v. | |
| RITE AID CORPORATION, AND | MEMORANDUM OPINION |
| RITE AID OF VIRGINIA, INC., <br> *Defendants.* | JUDGE NORMAN K. MOON |

This matter is before the Court on the parties' cross-motions for summary judgment. On October 26, 2007, for the reasons stated below, I granted Defendants' Motion for Summary Judgment with respect to all claims and denied Plaintiff's motion.

## I. BACKGROUND

This case arises out of Plaintiff's employment as a pharmacist with Rite Aid of Virginia, Inc., a wholly owned subsidiary of Rite Aid Corporation (collectively "Defendants" or "Rite Aid"). Plaintiff began working for Defendants at the Stuarts Draft, Virginia Rite Aid store in October 2004. Several months later, after an altercation with a customer, Plaintiff transferred to the Rite Aid store in Staunton, Virginia.

Plaintiff began work at the Staunton store in February 2005. In September 2005, Plaintiff, who is white, male, and heterosexual, called the Rite Aid employee complaint hotline to complain of harassment by several of his co-workers. He also took his complaints directly to Linda Hall, who was then Rite Aid's Regional Human Resources Manager. Specifically,

Plaintiff claimed that he was racially harassed by Louise James through her use of racial slurs and her denigrating comments about interracial couples, and that he was sexually harassed by James, Tamar Grier, and Heather Rankin Killen through their questions and comments insinuating that Plaintiff is homosexual.[1] Plaintiff also claimed that the Staunton store manager had discouraged him from reporting his complaints to Rite Aid.

Hall undertook an investigation of Plaintiff's allegations, which ultimately revealed that they were largely true and that several employees had in fact violated Rite Aid policies. During Hall's investigation, however, several of Plaintiff's co-workers complained to Hall about Plaintiff. Among these was a co-worker's complaint that after Plaintiff had filled the co-worker's personal anti-anxiety medication prescription, he had said to her "here are your happy pills," and that this statement could have been heard by others. (Hall Decl., Ex. C.)[2] Also during Hall's investigation, Plaintiff revealed to Hall, unprompted, that a particular pharmacy customer had AIDS. (Verrinder Dep. 286:3–287:8.) Although Plaintiff did not state the customer's name, Hall had already learned the customer's name through the course of her investigation.

Following Hall's investigation, Plaintiff's relations with his co-workers and with Rite Aid management continued to deteriorate. In November 2005, the manager of the Staunton store contacted Hall on several occasions to report various alleged difficulties resulting from Plaintiff's behavior at work. That same month, Plaintiff, who was upset that Defendants had not fired the employees who had allegedly harassed him, began taking his complaints regarding those same incidents of harassment to high-level Rite Aid executives. Around this time, Plaintiff also filed a

---

[1] Although James was included in Plaintiff's sexual harassment complaint to Rite Aid, his Amended Complaint in this lawsuit does not attribute any sexual harassment to James.

[2] Direct citations to deposition transcripts, declarations, and their accompanying exhibits indicate that the cited materials may be found in Defendants' Appendix in Support of Their Motion for Summary Judgment. All other

Charge of Discrimination against Rite Aid with the Equal Employment Opportunity Commission (EEOC) based on these same complaints.

In December 2005, Hall, Pharmacy District Manager Mark Owens, and District Manager Chris Watson met with Plaintiff to inform him of the results of Hall's investigation, including the fact that several Rite Aid employees had been reprimanded for violating Rite Aid policy, with James and Grier being issued written notices informing them that their employment would be terminated if they repeated their offending conduct. Plaintiff was also told that all Staunton store employees would be required to attend anti-harassment/discrimination training.

In addition, at this same meeting, Plaintiff was given a formal "Written Notice" arising out of his statement to Hall that a particular customer had AIDS and his alleged "here are your happy pills" comment. Among other things, the Notice stated that "Rite Aid's policy is to protect medical information of patients, including associates.[3] The federal HIPAA Privacy Regulation[4] provides standards for that protections [*sic*] and Rite Aid conforms to those standards." (Verrinder Dep., Ex. 18.) The Notice also informed Plaintiff that he would be required to repeat Rite Aid's HIPAA training and warned him to "refrain from engaging in this behavior in the future or . . . be subjected to discipline up to and including discharge." (*Id.*) Although requested to do so, Plaintiff refused to sign the Written Notice.

Through the next several months, Plaintiff persisted in complaining to Rite Aid's upper-management, including the CEO and the board of directors, about their failure to terminate the

---

citations to evidence in the record will specify the filing to which the materials were attached (e.g., Pl.'s Mot. Summ. J., Ex. 12 at 40).

[3] Rite Aid refers to store employees as "associates."

[4] The acronym "HIPAA" refers to the Health Insurance Portability and Accountability Act, Pub. L. No. 104-191, 110 Stat. 1936 (1996). Congress included in HIPAA provisions that mandate the adoption of federal privacy protections for individually identifiable health information. Pursuant to that mandate, the U.S. Department of Health and Human Services has promulgated a regulation known as the Privacy Rule, 45 C.F.R. §§ 160, 162, 164 (2007).

employees who had allegedly harassed him, and also about the Written Notice he had been issued. This continued even after Plaintiff was asked to stop directly contacting high-level company officials and instead to utilize Rite Aid's employee complaint procedure. The tone of many of Plaintiff's communications was hostile, with Plaintiff describing various managers and executives as "clowns," "bozos," and "bimbos,"[5] and threatening them with lawsuits and the loss of their jobs. (Verrinder Dep., Ex. 38 at 4; LeClair Decl., Ex. E; McClure-Demers Decl., Ex. A.)

During this period, in January 2006, Plaintiff also complained to Defendants of a new instance of sexual harassment by Killen. Hall investigated and determined that no disciplinary action was warranted.

In February 2006, Plaintiff sent an email to several Rite Aid managers and executives, including the CEO and the Regional Vice President, accusing James and Killen, two of the co-workers who had allegedly harassed him, of intentionally changing two customers' refill medications to something other than what had been prescribed. In the email, Plaintiff asserted that "[i]ntentionally attempting to give someone the wrong medication is attempted criminal assault," and asked, "Will you call the local prosecutor or should I?" (Verrinder Dep., Ex. 48.) Two days later, on February 14th, Regional Vice President Karen Staniforth, Human Resources Manager Carl Seelye, and Pharmacy District Manager Mark Owens arrived at the Staunton store to investigate, whereupon it was determined that the prescriptions had been properly filled and that the only error was Plaintiff's in mistakenly changing one of the prescriptions in the store computer after the fact to reflect something other than what had actually been prescribed.

---

[5] In some communications, Plaintiff referred to Rite Aid CEO Mary Sammons as "Mary Poppins" and, on one occasion, "Carly Fiorina," presumably in reference to the former high-profile CEO of Hewlett-Packard who, about a year earlier, had been ousted from her position by the board of directors. (Verrinder Dep., Ex. 38 at 12, 13, 35.)

According to Defendants, while the three Rite Aid managers were interviewing him, Plaintiff became agitated and aggressive, and made threatening comments regarding Linda Hall and Mary Sammons. Defendants also claim that later that day, Plaintiff made threatening comments regarding a new pharmacy technician at the Staunton store and tried to obtain the technician's home telephone number. Plaintiff also allegedly told Killen, who resigned the same day, that "there just may be another Valentine's Day massacre" and that "lots of people were going to be gotten rid of soon." (Seelye Decl., Ex. E.)

According to Defendants, it was because of these comments and his aggressive behavior on February 14th that Plaintiff was suspended with pay on February 15th, pending a determination of whether or not he would be terminated. His complaints and threats to Rite Aid officials continued unabated, and in early March, Defendants terminated Plaintiff's employment.

In April 2006, Plaintiff filed suit against Defendants based on claims of a hostile work environment and retaliation, both in violation of Title VII of the Civil Rights Act of 1964. (Civ. No. 3:06cv00017.) In May 2006, Plaintiff filed a separate suit against Defendant Rite Aid Corporation claiming defamation and defamation per se. (Civ. No. 3:06cv00024.) On August 2, 2006, I dismissed Plaintiff's sole count of defamation for failure to state a claim upon which relief could be granted, and I consolidated the two cases on August 29, 2006. Following the dismissal of the defamation count, there remain thirty-two separate counts between Plaintiff's two Amended Complaints.

In March 2007, I granted Plaintiff's motion to voluntarily dismiss his claims for damages relating to any type of emotional distress. In May 2007, Plaintiff's attorney withdrew, and

Plaintiff has since been proceeding *pro se*.[6] On June 8, 2007, the parties filed cross-motions for summary judgment. For the reasons stated in my Order of August 3, 2007, I did not hear oral arguments on these motions. On October 26, 2007, I entered an Order granting Defendants' motion for summary judgment and denying Plaintiff's motion; the purpose of this Memorandum Opinion is to set forth my reasons for doing so.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that a court should grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[7] Fed. R. Civ. P. 56(c). "As to materiality . . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Moreover, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Furthermore, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 250. Summary judgment under Rule 56 is appropriate only when the court, viewing the record as a whole and drawing reasonable inferences in the light most favorable to the nonmoving party, determines that the Rule 56(c) standard has been met. *See, e.g., id.* at 248–50 (1986); *Celotex*

---

[6] In addition to being a licensed pharmacist, however, Plaintiff is also a graduate of the University of Arizona College of Law and a member of the patent bar. (Verrinder Dep. 81.)

[7] Prior to the restyling of the Federal Rules of Civil Procedure that took effect on December 1, 2007, this portion of Rule 56(c) provided that a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

*Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir.1999); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994); *Terry's Floor Fashions, Inc. v. Burlington Indus., Inc.*, 763 F.2d 604, 610 (4th Cir. 1985).

If the nonmoving party bears the burden of proof, "the burden on the moving party may be discharged by 'showing' ... an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If the moving party shows such an absence of evidence, the burden shifts to the nonmoving party to set forth specific facts illustrating genuine issues for trial. *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.

A court should grant a motion for summary judgment if, after adequate time for discovery, the nonmoving party fails to make a showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The nonmoving party "may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in [Rule 56]—set out specific facts showing a genuine issue for trial."[8] Fed. R. Civ. P. 56(e)(2). Indeed, the nonmoving party cannot defeat a properly supported motion for summary judgment with mere conjecture and speculation. *Glover v. Oppleman*, 178 F. Supp. 2d 622, 631 (W.D. Va. 2001) ("Mere speculation by the non-movant cannot create a genuine issue of material fact."). The trial judge has an "affirmative obligation" to "prevent 'factually unsupported claims and

---

[8] Under the previous version of the Federal Rules of Civil Procedure, this portion of Rule 56(e) provided that the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but ... [must] by affidavits or as otherwise provided in . . . [Rule 56] set forth specific facts showing that there is a genuine issue for trial."

defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 317).[9]

## III. DISCUSSION

The thirty-two remaining counts of Plaintiff's Amended Complaints may be divided into three general categories: Title VII hostile work environment claims, Title VII retaliation claims, and defamation per se claims. I will address each in turn.

### A. HOSTILE WORK ENVIRONMENT

In his Amended Complaint setting forth his claims under Title VII, Plaintiff complains of a hostile work environment created by the statements of several of his co-workers. He alleges that James used offensive racial slurs about African-Americans in his presence and made derogatory comments about white people involved in interracial relationships. He also alleges that Grier and Killen repeatedly asked him to "prove" his sexual orientation and joked that his marriage was a sham. (*See* Am. Compl. (Civ. No. 3:06cv00017) ¶¶ 2, 8, 12.) Plaintiff, who is white, is married to a woman who was "born in Zambia to Indian parents." (Sumana Verrinder Dep. 48:10–11.)

To establish a hostile work environment claim, Plaintiff must show that the conduct of which he complains was (1) unwelcome; (2) based on sex or race; (3) sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment; and

---

[9] Having reviewed the parties' burdens on cross-motions for summary judgment to set out evidence of specific facts, a brief word on Plaintiff's citations to the record is in order. Plaintiff's citations are, to say the least, sparse, both in quantity and specificity. Because Plaintiff is proceeding *pro se*, when his filings state or imply the existence of record evidence but do not cite to any, I have undertaken reasonable efforts to find such evidence in the record. I have done likewise when his citations to the record are vague and the evidence therefore difficult to locate. Nevertheless, "[j]udges are not like pigs, hunting for truffles buried in briefs," or, in this case, buried in the voluminous record, and the burden of clearly and accurately setting forth evidence that supports his claims remains Plaintiff's. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991).

Case 3:06-cv-00024-NKM-BWC   Document 148   Filed 12/11/07   Page 8 of 49   Pageid#: 1900

(4) imputable to Defendants. *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (sex); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183–84 (4th Cir 2001) (race). There is no dispute that Plaintiff's co-workers' alleged utterances were unwelcome, and thus the first element of a hostile work environment claim is satisfied. However, Defendants dispute the latter three elements.

### 1. Count One: "Title VII Regarding Race"

Plaintiff's co-worker, Louise James, admitted to using derogatory racial slurs to refer to African-Americans. (Hall Dep., Ex. 3.) Plaintiff lacks standing, however, to assert a Title VII claim based on James's use of those slurs because Plaintiff is white—he is not a member of the group to which the slurs referred. Although James's language was undeniably offensive, it did not refer to Plaintiff and was not directed at him. James's statements were certainly based on race, but they were not based on *Plaintiff's* race. Thus, Plaintiff lacks standing to sue on the basis of James's use of the racial epithets. *See Childress v. City of Richmond*, 134 F.3d 1205, 1209 (4th Cir. 1998) (en banc) (affirming by an evenly divided vote the district court's dismissal of a "hostile environment claim on the ground that the complaining officers did not have standing under Title VII to bring an action for discrimination directed at others."); *Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176, 1180 (7th Cir. 1998) ("If unease on observing wrongs perpetrated against others were enough to support litigation, all doctrines of standing and justiciability would be out the window.").

Plaintiff's allegation of harassment based on James's disparaging comments about whites who are romantically involved with non-whites, however, does state a viable claim for relief. Harassment of a white person based on his or her relationship with a member of a different race

is racial harassment because it would not occur if the victim were not white. *Deffenbaugh-Williams v. Wal-Mart Stores*, 156 F.3d 581, 588–89 (5th Cir. 1998); *see also Collin v. Rectors and Visitors of Univ. of Va.*, No. 96-1078, 1998 WL 637420, at *2 (4th Cir. Aug. 31, 1998) (unpublished per curiam opinion) ("Although . . . [the Fourth Circuit] has no published authority directly on point, it is generally accepted that the spouses of members of protected parties may be able to make out a prima facie case of discriminatory discharge [under Title VII]. That is true because the plaintiff is alleging 'by definition, that he has been discriminated against because of his race.'" (quoting *Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 892 (11th Cir. 1986))); *cf. Murrell v. Ocean Mecca Motel, Inc.*, 262 F.3d 253, 258 (4th Cir. 2001) ("It is well-settled that a claim of discrimination based on an interracial relationship or association is cognizable under Section 1981."). Plaintiff alleges that James knew of Plaintiff's interracial marriage, and he at least implies that James intended for Plaintiff to hear her comments.

Defendants argue that James' comments were directed at couples consisting of whites and African-Americans, and that Plaintiff, whose wife is of Indian descent, is not included in this class and the comments were therefore not directed at him. Despite Defendants' arguments to the contrary, however, Plaintiff's deposition does not support their claim that it was only one particular type of interracial relationship which concerned James. Although Plaintiff does refer to a specific instance involving a white woman with an African-American man (Verrinder Dep. 277:21–278:1), he goes on to accuse James of making disparaging remarks when she would see a "white person" in a relationship with "a minority" (Verrinder Dep. 278). And while it is true that he does not claim that any comments *directly* targeted his marriage (Verrinder Dep. 469:19–

472:5),[10] and he admits that James had never met his wife nor seen a picture of her (Verrinder Dep. 278:6–25), such showings are not necessary so long as Plaintiff can show that he is a member of the vilified group. *Yuknis v. First Student, Inc.*, 481 F.3d 552, 554 (7th Cir. 2007). James made comments which disparaged Plaintiff indirectly, and did so because of his race.

Having found that James' comments on interracial couples were both unwelcome and based on Plaintiff's race, it remains to consider whether they were so pervasive as to create a hostile work environment and whether they may be fairly attributed to Defendants. Whether harassment is severe enough to constitute a hostile work environment must be evaluated according to all the circumstances. *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 242 (4th Cir 2000). Factors to consider include (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Petty indignities and sporadic offenses, whether racially oriented or not, are to be expected as part of human affairs, including employment, and do not implicate Title VII. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998). Even a truly shocking remark, if isolated, is generally inadequate to create a

---

[10] Toward the end of his lengthy deposition testimony, Plaintiff did, for the first and only time, make a half-hearted claim that James made a disparaging comment regarding an Indian/white interracial couple:

> Q: The only comments she made about interracial relationships were between black people and white people; is that correct?
> A: I think there was an Indian couple there, one time. Indian with a white person.
> Q: You think?
> A: Pretty sure there was. I don't—I can't claim what every race every person is. He wasn't black. Something else. I don't know what he was.
> . . . .
> Q: You never specifically complained about that incident to anyone at Rite Aid, did you?
> . . . .
> A: Not that particular specific incidence.

(Verrinder Dep. 472:10–473:22.)

hostile work environment. *Jordan v. Alternative Res. Corp.*, 458 F.3d 332, 339–40 (4th Cir.

2006). Rather, the harassment must be "sufficiently severe or pervasive to alter the conditions of

employment and create an abusive atmosphere." *Spriggs*, 242 F.3d at 183–84. "[I]n order to be

actionable under the statute, a[n] . . . objectionable environment must be both objectively and

subjectively offensive, one that a reasonable person would find hostile or abusive, and one that

the victim in fact did perceive to be so." *Faragher*, 524 U.S. at 787 (citing *Harris v. Forklift*

*Sys., Inc.*, 510 U.S. 17, 21–22 (1993)); *see also Spriggs*, 242 F.3d at 184 (citing *Lissau v. S. Food*

*Serv., Inc.*, 159 F.3d 177, 183 (4th Cir.1998)).

In his deposition testimony, Plaintiff described James's comments regarding interracial

couples as follows:

> Well, she has two different sets of statements. There's one particular girl that,
> I guess, is married to a black guy, and every time she sees that girl she would say,
> she's a pretty white girl. She could have any white guy. What is she doing with him.
> And then other times, when she would see a white person with a minority, she would
> say, that person is white. Don't they know they're white? Don't they know they
> should be with a white person?

(Verrinder Dep. 277:21–278:5.) James's comments were undoubtedly both subjectively and

objectively offensive, but certainly less so than direct personal insults or the use of racial

epithets. As to their frequency, Plaintiff claims that prior to his initial meeting with Linda Hall,

James made these sorts of comments approximately a dozen times.[11] (*Id.* at 289:25–290:13.)

Plaintiff began working at the Staunton store on or around February 16, 2005. (*Id.* at 213:9–15.)

On September 20, 2005, approximately thirty weeks later, Hall first met with Plaintiff and began

her investigation of his complaints. (*Id.* at 289:13–16, 296:14–297:3.) Although Plaintiff offers

---

[11] Plaintiff has not placed any evidence in the record that would substantiate this estimate. In his written statement to Linda Hall, he claimed only that James "also makes derogatory comments about inter racial couples." (Hall Dep. 34:11–24, Ex. 2.) In his Amended Complaint, Plaintiff states only that James "makes derogatory

no evidence regarding the exact temporal distribution, a dozen comments over thirty weeks works out to an average of one comment every two-and-a-half weeks. Thus, "the frequency of the discriminatory conduct," *Smith*, 202 F.3d at 242, while by no means de minimus, does not strongly favor Plaintiff's claim. *See Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995) ("A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage.").

Moreover, there is no indication of physical threat or personal humiliation to Plaintiff, and there is no reason to think that James's comments unreasonably interfered with Plaintiff's work performance. Plaintiff has not alleged that he could not fill prescriptions because of the occasional obnoxious remarks. Finally, Plaintiff was the manager of the Staunton store pharmacy; James was a non-pharmacist technician and thus was Plaintiff's subordinate. (*See* Owens Dep. 29:16–30:5.) While I will not decide, as a matter of law, that a subordinate cannot create a hostile work environment for a manager, the threshold for interfering with work performance will surely be higher than when the manager is the harasser. *See Odom v. St. Louis Cmty. Coll.*, 36 F. Supp. 2d 897, 903 (E.D. Mo. 1999).

In sum, consideration of all the *Smith/Harris* factors reveals that Plaintiff was not subjected to a hostile work environment by James's comments on interracial relationships. Although a reasonable person in Plaintiff's shoes would have been disturbed by her occasional offensive remarks, they were neither severe nor pervasive enough to constitute an abusive working environment or to alter the terms and conditions of his employment.[12] Even when the

---

comments about inter-racial couples anytime an inter-racial couple appears at the pharmacy. James also makes derogatory comments about Caucasians in inter-racial relationships." (Am. Compl. (Civ. No. 3:06cv00017) ¶ 2.)

[12] In addition, Plaintiff's claim must also fail because James's comments cannot be imputed to Defendants. Although Plaintiff has claimed that James continued to make offensive comments about interracial couples after she

Case 3:06-cv-00024-NKM-BWC   Document 148   Filed 12/11/07   Page 13 of 49   Pageid#: 1905

facts are viewed in the light most favorable to Plaintiff, no reasonable jury could return a verdict in his favor. Accordingly, there is no genuine issue of material fact, and Defendants are entitled to summary judgment on Count One of Plaintiff's amended Title VII complaint.

### 2. Counts Two and Thirteen: "Title VII Regarding Sex"

In Counts Two and Thirteen, Plaintiff accuses his co-workers, Heather Rankin Killen and Tamar Grier, respectively, of sexual harassment. Plaintiff alleges that Killen and Grier repeatedly insinuated that he is homosexual, asking him to prove his sexual orientation and implying that the woman who would call him at work was not really his wife but merely someone he had persuaded to help him try to convince his coworkers he was married.[13] Because sex and race are parallel categories under Title VII, the same analytic framework applies.

Killen and Grier's behavior was clearly unwelcome. Moreover, Plaintiff alleges that their comments were based on Plaintiff's gender. (Am. Compl. (Civ. No. 3:06cv00017) ¶¶ 129, 175.) Plaintiff offers no evidence, however, by which a reasonable jury could find that Grier and Killen's comments were based on his gender.[14] Harassment which is merely sexual in content, but non-discriminatory in its victims, is not a violation of Title VII. "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998) (citations omitted). Put another way, "[a]n employee is harassed or otherwise discriminated against 'because of' his or her sex if, 'but-for'

---

[13] According to the written statement Plaintiff gave to Hall, Killen's primary offense was in repeating or relaying Grier's comments to Plaintiff. (Verrinder Dep., Ex. 9.)

[14] Plaintiff may have been harassed because he held himself out as heterosexual. However, "Title VII does not afford a cause of action for discrimination based upon sexual orientation." *Wrightson v. Pizza Hut of Am.*, 99 F.3d

was reprimanded, he admits that he made no further complaints based on subsequent harassment. (Verrinder Dep. 325:1–10.) The issue of imputation to Defendants is discussed in greater detail below.

the employee's sex, he or she would not have been the victim of the discrimination." *Wrightson v. Pizza Hut of Am.*, 99 F.3d 138, 143 (4th Cir. 1996) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989); *Fuller v. Phipps*, 67 F.3d 1137, 1144 (4th Cir. 1995)). That is, Plaintiff must show that he would not have been subjected to offensive comments about his sexual orientation if he were not male.

Plaintiff admits that he cannot show that other men in the same store were similarly targeted.[15] (Verrinder Dep. 259:21–261:10.) He does, however, offer non-gender-related reasons why these men might have been off-limits: one was allegedly the son of the store manager, while the other had previously invited all store employees to his home, where they were able to meet his wife in person. (Pl.'s Resp. Def.'s Mot. Summ. J. 7.) In addition, there is no evidence that any woman was similarly subjected to suggestions that she was homosexual. While this level of proof is inadequate to support summary judgment in favor of Plaintiff, it might be sufficient to show a genuine issue of material fact as to whether the unwelcome conduct was based on Plaintiff's sex.

Turning to the next step of the analysis, it is questionable whether the unwelcome conduct was sufficiently severe or pervasive so as to alter the conditions of Plaintiff's employment and create and abusive work environment. Certainly, he has not alleged that he was

---

138, 143 (4th Cir. 1996) (citing *Williamson v. A.G. Edwards & Sons, Inc.*, 876 F.2d 69, 70 (8th Cir. 1989); *DeSantis v. Pac. Tel. & Tel. Co.*, 608 F.2d 327, 329–30 (9th Cir. 1979)).

[15] When Plaintiff was pressed on this issue at his deposition, the following exchange occurred:

> Q: . . . Your answer then is, [Grier] didn't ask the other male [pharmacist], who was in the exact same position as you, correct?
> A: I don't know if she did or didn't. I doubt it.
> Q: All right. Doubting that it happened, you would agree with me that it wasn't because you're a male, it was because of some unique characteristic that you have?
> A: No.
> Q: Why not?
> A: Because that's what you want me to say so you can run a summary judgment motion.

unable to fulfill his duties as a pharmacist because of Grier and Killen's comments. I need not decide the issue, however, because Plaintiff fails to satisfy the fourth step of the analysis in that he fails to show that the unwelcome conduct was imputable to Defendants.

Employee conduct may be imputed to the employer by showing that the employer "knew or should have known about the harassment and failed to take effective action to stop it." *Ocheltree*, 335 F.3d at 333–34 (citing *Spicer v. Va. Dep't of Corr.*, 66 F.3d 705, 710 (4th Cir. 1995)). Plaintiff presents no evidence that Defendants were aware of Killen and Grier's comments before Plaintiff made his first complaints about them. Nor does he argue that Defendants should have known; indeed, it is difficult to see how such an argument could be sustained. However, once Plaintiff brought the alleged harassment to their attention, Defendants took prompt and effective action to stop it. Plaintiff called the Rite Aid employee complaint hotline to complain of sexual harassment on September 15, 2005. (Verrinder Dep., Ex. 7.) On September 20, 2005, Linda Hall arrived at the Staunton store to investigate Plaintiff's complaint. (*Id.* at 255:4–9.) Ten days later, on September 30, 2005, Defendants formally reprimanded Grier and informed her that any repetition of the offending conduct would result in termination. (Hall Dep., Ex. 5.) Although it does not appear that Killen was disciplined for her statements, Hall did interview her, and Plaintiff concedes that the purported sexual harassment ceased after September 2005.[16] (Pl.'s Resp. Defs.' Mot. Summ. J. 7.)

To hold Defendants liable under these circumstances "would be tantamount to imposing strict liability on an employer for all work place conversations that are inappropriate, regardless

---

(Verrinder Dep. 260:21–261:10.)

[16] Presumably, Plaintiff did not intend this concession to refer to the claim in Count Sixteen of his Amended Complaint of a single subsequent instance of alleged sexual harassment by Killen. (*See* Am. Compl. (Civ. No. 3:06cv00017) ¶¶ 186–91.) Count Sixteen is addressed below.

Case 3:06-cv-00024-NKM-BWC    Document 148    Filed 12/11/07    Page 16 of 49    Pageid#: 1908

of the employer's knowledge of them or response." *Spicer v. Va. Dep't of Corr.*, 66 F.3d 705, 711 (4th Cir. 1995). As the Fourth Circuit made clear in *Spicer*, such a result would be inconsistent with established law. *Id.* at 710–11. Accordingly, because Defendants took prompt and effective action once they were made aware of the allegedly hostile work environment, liability under Title VII cannot attach, and Defendants are therefore entitled to summary judgment on Counts Two and Thirteen of Plaintiff's amended Title VII complaint.

### 3. Count Sixteen: "Title VII Harassment by Killen on January 13, 2006"

In January 2006, Plaintiff again complained of sexual harassment by Killen.[17] Plaintiff's complaint, sent to the Vice President of Field Human Resources and Defendants' Employment Law Counsel (Verrinder Dep. 457:9–24), stated the following:

> The homosexual customer who wanted to know if I am available was just in the store and said to Heather Killen that seeing me made it worthwhile to come into the store. Heather laughed and said "What I am not goodenough [*sic*] for you. [*sic*]" Do you intend to do anything about this harassment?

(*Id.* at Ex. 21.)

This "harassment" may have been unwelcome, but it otherwise utterly fails to satisfy the requirements of Title VII. It was not obviously based on Plaintiff's sex, because it is the sort of comment that could easily have been made even if Plaintiff were a woman. It was not pervasive, being only an isolated instance of a subordinate saying something Plaintiff did not like. Nor was it severe; indeed, a reasonable jury would be hard-pressed to find it anything other than completely innocuous. Furthermore, there is no evidence suggesting that it was meaningfully directed at or about Plaintiff at all. Instead, it calls attention to Killen's gender and relative attractiveness rather than Plaintiff's.

Despite the complaint's almost laughable nature, Linda Hall nonetheless dutifully investigated. According to her notes, Killen told her that the comment was intended to "deflect the issue away from [Plaintiff]" (Hall Dep., Ex. 30), which is certainly a more reasonable explanation for it than harassment. Hall found that Killen's comment did not warrant disciplinary action. (Hall Decl. ¶ 6.) Similarly, I find that it does not warrant imposing liability under Title VII. Accordingly, Defendants are entitled to summary judgment on Count Sixteen of Plaintiff's amended Title VII complaint.

### 4. Count Seventeen: "Title VII Regarding Race"

In his Amended Complaint, Plaintiff alleges that on January 2, 2006, a pharmacy technician named Annette Argenbright told him about a New Year's Eve party she had attended. (Am. Compl. (Civ. No. 3:06cv00017) ¶¶ 103–04.) In telling the story, she recounted witnessing a marriage proposal by an African-American man to a white woman, and then she allegedly remarked to Plaintiff that "it was wrong for people of different colors to mix." (*Id.* ¶ 104.) Plaintiff argues that this comment created a hostile work environment in violation of Title VII. (*Id.* ¶ 192–97.)

Nowhere in his complaint or elsewhere, however, does Plaintiff even allege, much less show, that Defendants were aware of this apparently isolated incident. Indeed, Plaintiff admitted at his deposition that he did not report this alleged comment to anyone at Rite Aid. (Verrinder Dep. 312:9–23; 346:2–15.) The complaint states only that "[t]he defendants knew of harassment at Rite Aid store #1270." (Am. Compl. (Civ. No. 3:06cv00017) ¶ 197.) Accordingly, the alleged

---

[17] This represents Plaintiff's only complaint to Defendants of any harassment, whether racial or sexual, allegedly occurring subsequent to the September 2005 resolution of his prior complaints.

Case 3:06-cv-00024-NKM-BWC   Document 148   Filed 12/11/07   Page 18 of 49   Pageid#: 1910

statement cannot be imputed to Defendants, who are therefore entitled to summary judgment on Count Seventeen of Plaintiff's amended Title VII complaint.

## B. RETALIATION

In addition to his claims of a hostile work environment, Plaintiff's Amended Complaint contains twelve counts of retaliation in violation of Title VII. Plaintiff claims that Defendants retaliated against him in a variety of ways for filing a complaint against them with the EEOC.

Title VII retaliation claims are governed by the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). As explained by the Fourth Circuit, the analysis proceeds as follows:

> The employee is initially required to establish a prima facie case of retaliation by a preponderance of the evidence. Such a prima facie case consists of three elements: 1) the employee engaged in protected activity; 2) the employer took adverse employment action against the employee; and 3) a causal connection existed between the protected activity and the adverse action. . . . Once a prima facie case has been presented, the employer then has the burden of producing a legitimate nondiscriminatory reason for the adverse action, thereby rebutting the presumption of retaliation raised by the prima facie case. The employer is not required to prove the absence of a retaliatory motive, but only to raise a "genuine issue of fact" as to whether retaliation for protected activity occurred. Finally, if the employer produces a legitimate nondiscriminatory explanation, the employee bears the ultimate burden of proving retaliation by demonstrating that the employer's proffered reason is pretextual.

*Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985) (citations omitted), *abrogated on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). With this standard in mind, I will address each of Plaintiff's retaliation claims in turn.

### 1. Count Fifteen: "Retaliation by Termination"

The most significant of Plaintiff's retaliation claims is that Defendants terminated his employment in retaliation for filing a complaint with the EEOC. There is no question that filing

a complaint of discrimination with the EEOC is a "protected activity" and that termination is an "adverse employment action." Whether Plaintiff has established a prima facie case of retaliation therefore turns on whether there was a "causal connection" between the filing of the complaint to the EEOC and the termination.

As the Fourth Circuit explained in *Ross*, "if the employer did not know of the protected activity a causal connection to the adverse action cannot be established." *Ross*, 759 F.2d at 365 n.9. Although Plaintiff had widely publicized to various Rite Aid managers and executives the fact that he had filed a complaint with the EEOC, this does not resolve the issue. The record evidence is undisputed that the person who terminated Plaintiff's employment, Regional Vice President Karen Staniforth, was new to her position and had not even heard of Plaintiff prior to receiving a February 12, 2006 email in which Plaintiff accused James and Killen of intentionally changing customers' refill medications to something other than what had been prescribed. (Staniforth Dep. 20:6–21:10, 71:3–7.) Staniforth testified unequivocally that at the time of her February 14, 2006 investigation, she was unaware of any prior complaint or allegation by Plaintiff regarding Defendants or their employees. (*Id.* at 35:14–21.) Indeed, it was only during her investigation that Staniforth learned generally that Plaintiff had ever complained of harassment when, according to her notes, "Bill asked me if I was aware of his case against the company and I informed him that I was not, that I had only been in [the] position for a few weeks and that I did not want to discuss this."[18] (Staniforth Dep., Ex. 6 at RAWV-0183.)

---

[18] Later in her notes, Staniforth recorded that Plaintiff again mentioned "his complaint," after which she wrote "I have no knowledge of the complaint or when it was filed." (Staniforth Dep., Ex. 6 at RAWV-0187.) She also recorded that she told Plaintiff that "despite [his] comments that no one did anything about his previous complaints (of which I have no knowledge), that, [*sic*] he had sent me the emails yesterday and I was here today to address his complaint and investigate the allegations. I explained that his previous issue had nothing to do with this and once again I knew nothing of it." (*Id.* at RAWV-0189.)

Staniforth was unequivocal, moreover, in testifying that Plaintiff did not inform her of Hall's investigation of his previous complaints, the results of that investigation, or his dissatisfaction with it. (*Id.* at 103:6–15). Furthermore, there is no evidence that Staniforth was aware specifically of Plaintiff's complaint to the EEOC. And record evidence is undisputed that, to whatever extent she became aware of Plaintiff's complaints on February 14, Staniforth did not discuss them with anyone in reaching her decision and therefore could not have learned anything further about them. (*Id.* at 35:22–36:16.) Indeed, Staniforth's deposition testimony makes clear that, although she discussed her findings with individuals in the Human Resources department and informed them of her intention to terminate Plaintiff's employment, she made the decision to terminate independently from those discussions. (*Id.* at 29:20–30:7, 80:18–81:22; *see also* LeClair Dep. 149:15–150:23.)

Plaintiff alleges that lurking behind this evidence is an unseen conspiracy, a "prearranged plan to terminate [his] employment if he did not quit first." (Pl.'s Resp. Def.'s Mot. Summ. J. 21.) Yet Plaintiff offers virtually no evidence of such a conspiracy, and "[m]ere speculation by the non-movant cannot create a genuine issue of material fact." *Glover v. Oppleman*, 178 F. Supp. 2d 622, 631 (W.D. Va. 2001). Plaintiff tries to substantiate his speculation by cobbling together a handful of statements by Staniforth and spinning them in such a way as to make them look significantly contradictory. (*See id.* at 20–21.) But even if I were to take Plaintiff's interpretation of these facts at face value, they show, at best, that Staniforth may have been more familiar with Plaintiff's EEOC complaint than Defendants suggest. And the fact that an employer's knowledge of the protected activity is necessary to finding a causal connection, does not mean that it is also sufficient for such a finding. *Ross*, 759 F.2d at 365 n.9.

Plaintiff rests his claim that there is such a connection on a theory of temporal proximity. (*See* Pl.'s Resp. Defs.' Resp. Opp'n Pl.'s Mot. Summ. J. 7.) Under such a theory, a prima facie case of retaliation may be established by the proximity in time between the protected activity and the adverse employment action if the temporal proximity is "very close." *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (citing cases in which spans of three and four months were insufficient to show causality). Plaintiff first complained of harassment to Rite Aid and threatened to go to the EEOC in September 2005, and his written complaint to the EEOC is dated October 11, 2005. (Verrinder Dep., Ex. 16 at P-24.) Given that his employment was terminated in early March 2006, at least five months passed between his protected activity and the adverse employment action. This degree of temporal proximity is insufficient to give rise to causality. *See, e.g.*, *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2005) (stating that a span of two-and-a-half months "is sufficiently long so as to weaken significantly the inference of causation between the two events"); *Pascual v. Lowe's Home Centers, Inc.*, 193 Fed. Appx. 229, 233 (4th Cir. 2006) (unpublished per curiam opinion) ("In this case, at least three to four months separated the termination of Pascual's employment and the claimed protected activities. We find that this time period is too long to establish a causal connection by temporal proximity alone."). As a result, Plaintiff cannot show a causal connection and therefore cannot satisfy his burden of proving a prima facie case of retaliation by a preponderance of the evidence.

Furthermore, even if I were to accept that Plaintiff has established a prima facie case of retaliation, Defendants are still entitled to summary judgment because Plaintiff fails to demonstrate that the many nondiscriminatory reasons for his termination offered by Defendants are merely pretextual. *See Rowe v. Marley Co.*, 233 F.3d 825, 831 (4th Cir. 2000) (stating that the employee "has not forecast any evidence that casts doubt on the veracity of [the employer's]

proffered explanation for his termination," and that "it is [the employee's] failure to demonstrate pretext on [the employer's] part that dooms his federal claims"). Defendants' proffered reasons for Plaintiff's suspension and termination include:

> (1) Plaintiff's threatening and intimidating behavior toward numerous Rite Aid associates, including Linda Hall, Carl Seelye and Karen Staniforth[,] and Mary Sammons, Rite Aid's CEO and President, whose head Plaintiff threatened to "rip off[,]" and Plaintiff's threat of "another Valentine's Day massacre;" (2) using abusive and vulgar language, including his degrading remarks to Rite Aid's management level employees in both e-mails and voicemails, as well as statements he made in front of Ms. Staniforth during her investigation and to Mr. Owens and Mr. Watson upon being informed of his suspension; (3) interfering with the performance of other associates, including his uncooperative behavior during Ms. Staniforth's investigation; (4) displaying gross insubordination and refusal to comply with instructions during the investigation of his complaints regarding the mis-filling of prescriptions, such as his refusal to write a statement; (5) disorderly conduct during Ms. Staniforth's investigative interview on February 14, 2006 on the company's premises, including his threatening behavior toward Mr. Seelye and his subsequent phone calls asking for pharmacy technician Julie's phone number to warn her to "get herself an f---ing lawyer;" (6) displaying rude and indifferent treatment toward Rite Aid associates; and (7) exhibiting conduct the company believes adversely reflects on the associates and the company.

(Defs.' Br. Supp. Mot. Summ. J. 41–42 (citing Staniforth Dep. 32–35, 101–02, Exs. 5–6).)

The foregoing list of reasons, though somewhat duplicative in parts, is well supported by evidence in the record. (*See* LeClair Decl., Ex. E; McClure-Demers Decl., Ex. A; Owens Dep. 117:13–20, 121:2–11; Seelye Decl., Exs. A at 5–7 & 10–11, D–E; Staniforth Dep. 32:15–35:13, 101:7–22, Exs. 5–7; Verrinder Dep. 598:6–601:24; 613:2–614:21, 628:7–629:1, Ex. 38 at 4, at 12–13, at 29, at 31–33, at 35, Ex. 40; Watson Dep. 113:12–24, Ex. 11.) Furthermore, as Defendants argue, these reasons "clearly constitute[] . . . legitimate, non-discriminatory reasons for Verrinder's termination." (Defs.' Br. Supp. Mot. Summ. J. 42–43 (citing cases).) Moreover, Plaintiff admits to much of this conduct, and in his filings, he denies none of it. As a result, the reasons put forth by Defendants undoubtedly raise "a 'genuine issue of fact' as to whether

– 23 –

retaliation for protected activity occurred," and the burden therefore shifts to Plaintiff to "prov[e] retaliation by demonstrating that the employer's proffered reason is pretextual." *Ross*, 759 F.2d at 365.

This Plaintiff utterly fails to do. Indeed, other than his conclusory assertion that there was a "prearranged plan to terminate [his] employment" (Pl.'s Resp. Def.'s Mot. Summ. J. 21), Plaintiff does not even address the issue of pretext. As the Fourth Circuit explained in *Beall v. Abbott Laboratories*:

> Beall has simply not produced sufficient evidence for a reasonable trier of fact to conclude that the decision to eliminate her territory had any relation to Beall's complaint of harassment. Without evidence of pretext for retaliation, this Court will not act as a "super-personnel department that reexamines an entity's business decisions." Beall has thus failed to show how any of the justifications for her employer's actions were mere pretext for retaliation against Beall. Accordingly, the defendants are entitled to summary judgment on Beall's retaliation claim.

*Beall v. Abbott Labs.*, 130 F.3d 614, 620 (4th Cir. 1997) (quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir.1986)), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). Like Beall, Plaintiff has not produced sufficient evidence for a reasonable jury to conclude that his termination had anything to do with his protected activity, and Defendants are therefore entitled to summary judgment on this claim.

### 2. Count Three: "Retaliation by Late Payment of Mileage"

In Count Three of his Amended Complaint, Plaintiff claims that in retaliation for filing his EEOC complaint, Defendants withheld mileage payments for "over four weeks beginning in the third week of December 2005 and ending in the fourth week of January 2006." (Am. Compl. (Civ. No. 3:06cv00017) ¶ 134.) To be clear, Plaintiff does not dispute that he was eventually paid; he claims only that the payments were late. According to Plaintiff, District Manager Chris

Watson, who was responsible for approving mileage reimbursement requests, learned of Plaintiff's EEOC complaint on November 30, 2005 and retaliated against Plaintiff by delaying the approval of his requests during the period specified. (*See, e.g.*, Pl.'s Mot. Summ. J. 10.)

Both parties' arguments on this issue rely on a mileage reimbursement spreadsheet generated by Defendants (Pl.'s Mot. Summ. J., Ex. 16), but both parties reference the incorrect date entries in making their arguments.[19] Rather than the "Exp Date," the date on which mileage was incurred, the relevant entry is the date on which reimbursement requests were submitted, which the spreadsheet titles "Entry Date." (*See* Defs.' Resp. Opp'n Pl.'s Mot. Summ. J. 19 n.19.) The fact that Plaintiff was not paid for mileage between December 14 and December 27, for example, can hardly be imputed to Defendants given that Plaintiff submitted no reimbursement requests between December 11 and December 27. (Pl.'s Mot. Summ. J., Ex. 16 at RAWV-0988, -1000.) By the same token, Defendants' argument that another employee was not paid until January 11 for mileage incurred on October 24 (Defs.' Resp. Opp'n Pl.'s Mot. Summ. J. 21 n.22) is not as significant once one realizes that the employee did not request reimbursement for that mileage until November 13 (Pl.'s Mot. Summ. J., Ex. 16 at RAWV-0990). In addition, because Plaintiff attributes the delay in being paid exclusively to Watson's delay in approving his requests, the other relevant entry is not the date of payment, but rather the date of approval.

Plaintiff's last reimbursement request prior to the claimed period of withholding was submitted on December 11 and approved on December 12. (Pl.'s Mot. Summ. J., Ex. 16 at RAWV-0988.) Plaintiff did not submit another request until December 27. (*Id.* at RAWV-1000.) Watson did not approve this or any subsequent request by Plaintiff until January 25. (*Id.*

at RAWV-0993.) Thus, Plaintiff's claim turns on a period of roughly four weeks, during which Plaintiff submitted requests totaling $673.28. (*Id.* at RAWV-0993, -1000.)

For the proposition that this withholding constitutes an adverse employment action, Plaintiff relies on the Sixth Circuit's holding in *White v. Burlington Northern & Santa Fe Railway Co.*, 364 F.3d 789 (Sixth Cir. 2004) that "[t]aking away an employee's paycheck for over a month is not trivial, and if motivated by discriminatory intent, it violates Title VII." *Id.* at 802 (citing *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223–24 (2d Cir. 2001)). On appeal, however, the Supreme Court clarified the standard for an adverse employment action:

> In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"
> We speak of material adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth "a general civility code for the American workplace." An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.

*Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2415 (2006) (citations omitted).[20] Although the Court agreed that, under the circumstances presented in that case, a reasonable employee could have found a month without pay to be materially adverse, *id.* at 2417–18, whether a reasonable employee would so construe a month without mileage reimbursements is a different question altogether.

To begin with, at least some delay between the submission of reimbursement requests and their approval would be expected by a reasonable employee in Plaintiff's position. A review of

---

[19] In Defendants' spreadsheet, entries related to Plaintiff's mileage requests are identified by the User ID "RXPWVV." (Pl.'s Resp. Defs.' Mot. Summ. J. 22.)

[20] The Supreme Court explained further that "[w]hether a particular [action] is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* at 2417 (internal quotation marks omitted).

Defendants' reimbursement records shows that Watson seldom approved requests the same day they were submitted, and that delays of one to two weeks were not uncommon. Moreover, during the holiday period, in which the withholding occurred, a number of employees experienced even longer delays, and there are two weeks in which Watson did not approve any requests. (*See* Pl.'s Mot. Summ. J., Ex. 16 at RAWV-0989–RAWV-0993.) Indeed, although Plaintiff's delay was somewhat longer most, it was by no means the longest. For example, the January 21 approval of several requests by "RXPAY1" was delayed forty-five days from the date of submission, and the January 5 approval of a request by "RXPSA16" was delayed fifty-four days.[21] (*Id.* at RAWV-0990, -0992.)

Given these facts, along with the fact that, unlike the situation in *White*, mileage payments were not Plaintiff's only source of income but instead were supplemental to his paycheck, no reasonable employee in Plaintiff's position could find that the withholding amounted to a materially adverse action, such that "it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *White*, 126 S. Ct. at 2415 (citations omitted). Accordingly, Plaintiff has failed to establish a prima facie case of retaliation, and Defendants are therefore entitled to summary judgment on this claim.

Were I to accept Plaintiff's argument, however, that the withholding amounts to a materially adverse action, and assuming without deciding that the temporal proximity between Plaintiff's protected activity and the withholding are sufficient to show causality, Defendants are still entitled to summary judgment on this claim because Plaintiff fails to show that Defendants' nondiscriminatory reasons for the withholding are pretextual. The principal reason put forth by

---

[21] In addition to the records in the spreadsheet is the deposition of Linda Hall, at which she was asked, "In your experience, was it rare to have to wait a month for a mileage check?" (Hall Dep. 128:18–19.) Hall's response was "I have waited for my own that long." (*Id.* at 128:20.)

Defendants and supported in the record is that due to the holiday season, Watson was very busy and was therefore slow to approve requests for many or most pharmacists during that period.[22] (Defs.' Br. Supp. Mot. Summ. J. 46.)  Plaintiff argues that Defendants' assertion is pretextual because it is false.  He claims that Watson approved 182 other mileage requests during the time that Plaintiff's requests were awaiting approval.[23]  (Pl.'s Resp. Def.'s Mot. Summ. J. 22.)  As previously explained, however, during the holidays, the delay between submission and approval was unusually long for many employees, and approvals for several requests were delayed even longer than for Plaintiff's.  Although the delay was somewhat longer for Plaintiff than for most employees, there is no evidence that this was purposeful, just as there is no evidence that the delay for those who waited almost as long as Plaintiff or even longer was purposeful.

### 3. Count Four: "Retaliation by Not Being Paid for December 15, 2005"

Plaintiff claims that in retaliation for filing his EEOC complaint, Defendants did not pay him for December 15, 2005.  Although scheduled to work that day, he claims that "an ice storm prevented [him] from traveling."  (Am. Compl. (Civ. No. 3:06cv00017) ¶ 138.)  Plaintiff argues in his Amended Complaint that because he was a salaried employee, he should have been paid despite not actually working.[24]  According to Defendants, Plaintiff was not paid for December 15

---

[22] Defendants also note Plaintiff's claim, raised in his reply brief, that "[t]he withholding of travel expenses was in retaliation for the Plaintiff telling Chris Watson that he would sue Chris Watson over the written notice."  (Pl.'s Resp. Defs.' Resp. Opp'n Pl.'s Mot. Summ. J. 7.)  If true, this would provide another nondiscriminatory reason, in that filing a lawsuit against a supervisor in his or her individual capacity is not a protected activity.  *Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 180 (4th Cir. 1998) ("An analysis of Title VII's language and its remedial scheme leads us to join the other circuit courts and conclude that supervisors are not liable in their individual capacities for Title VII violations.").

[23] In fact, during the relevant time period from December 27 through January 25, roughly 140 mileage reimbursement requests were approved.  (*See* Pl.'s Mot. Summ. J., Ex. 16 at RAWV-0989–RAWV-0993.)

[24] It is unclear what Plaintiff believes to be the relevance of his alleged status as a salaried employee.  In any event, Plaintiff's deposition testimony directly contradicts this assertion.. (*See* Verrinder Dep. 547:10–14 ("Q: Your salary, do you have any dispute that you've been paid your salary for every day that you worked at Rite Aid, except December 15th and February 6th?  A: I dispute that I was salaried.")

because he not only did not report to work, but also took no steps to enable the pharmacy to remain open that day other than leaving a voice mail message late the night before on the district pharmacy manager's cell phone.

Plaintiff's claim does not rise to the level of a materially adverse employment action because no reasonable employee would have found not being paid for one day on which the employee did not work to be materially adverse under the circumstances. Plaintiff may or may not be correct that he should have been paid, but it is hardly unreasonable, nor unexpected to a reasonable employee, that an employer might be reluctant to pay an employee for work that was not performed. Plaintiff further argues, without citation, that "[t]he Fourth Circuit has held that refusing to allow an employee to make up missed time because of bad weather can be considered retaliatory." (Pl.'s Resp. Def.'s Mot. Summ. J. 23.) Yet even if this is a correct statement of the law, Plaintiff offers no evidence that he attempted to make up the missed time or that he was refused the opportunity to do so.

Moreover, as with his claim of retaliatory termination, Plaintiff offers nothing more than conclusory assertions in attempting to carry his burden of demonstrating that Defendants' proffered reason for not paying him (i.e., the fact that he did not work that day) is pretextual. Accordingly, Defendants are entitled to summary judgment on this claim.

### 4. Count Five: "Retaliation by Not Being Paid for Last Week of Work"

Plaintiff claims that he received his last paycheck six weeks late. (Am. Compl. (Civ. No. 3:06cv00017) ¶ 142; Pl.'s Resp. Def.'s Mot. Summ. J. 23.) Plaintiff offers no evidence of a causal connection with his protected activity. Moreover, the evidence is uncontroverted that

Defendants' tardiness was due to a clerical error. (LeClair Decl. ¶ 11.) Because Plaintiff fails to show that this reason is pretextual, Defendants are entitled to summary judgment on this claim.

### 5. Count Six: "Retaliation by Not Paying Annual Bonus"

Plaintiff claims that Defendants retaliated against him by not paying him an annual bonus to which he was entitled. (Am. Compl. (Civ. No. 3:06cv00017) ¶ 146.) This is not, however, a materially adverse employment action because Rite Aid's bonus policy expressly states that "[t]he associate must be actively employed by Rite Aid Corporation on the date the bonus is distributed." (LeClair Decl., Ex. F. at RAWV-0231) Given that bonuses for 2005 were paid on or about May 12, 2006, and Plaintiff was not employed by Rite Aid at that time, no reasonable employee in his position would have even expected a bonus. (LeClair Decl. ¶ 6.) Rite Aid's bonus policy also provides a nondiscriminatory reason for not paying Plaintiff a bonus, and Plaintiff offers no evidence to show that this reason is pretextual. Accordingly, Defendants are entitled to summary judgment on this claim.

### 6. Count Seven: "Retaliation by Not Paying Plaintiff for February 6, 2006"

Plaintiff claims that he was not paid for February 6, 2006. (Am. Compl. (Civ. No. 3:06cv00017) ¶ 150.) The evidence Plaintiff cites for this proposition shows only that he worked on February 6; it does not show that he was not paid. (Pl.'s Mot. Summ. J., Ex. 17.) Thus, Defendants' evidence that he in fact was paid for February 6 is uncontroverted (*see* LeClair Dep. 161–62; LeClair Decl. ¶ 10, Ex. I), and Defendants are therefore entitled to summary judgment on this claim.

Case 3:06-cv-00024-NKM-BWC   Document 148   Filed 12/11/07   Page 30 of 49   Pageid#: 1922

*7. Count Eight: "Retaliation by Harassing Plaintiff with Noise"*

Plaintiff claims that Defendants retaliated against him for filing a complaint with the EEOC by "plac[ing] three holiday decorations next to the pharmacy that continually made excessive noise. This noise made it very difficult to concentrate on filling prescriptions." (Am. Compl. (Civ. No. 3:06cv00017) ¶ 154.) Plaintiff's claim is not a materially adverse action; indeed, it is among precisely the sort of "petty slights or minor annoyances that often take place at work and that all employees experience," which cannot support a Title VII retaliation claim. *White*, 126 S. Ct. at 2415. The frivolousness of Plaintiff's claim becomes even more apparent when considered in light of the uncontroverted evidence that "similar displays were placed in a similar location in every store in [the] district" (Owens Decl. ¶ 4), and that after Plaintiff complained,[25] the display "was removed and the problem resolved" (Owens Dep. 65:2). Defendants are entitled to summary judgment on this claim.

*8. Count Nine: "Retaliation by Not Paying Mileage for February 15, 2006"*

Plaintiff claims that he was not paid mileage for traveling to and from work on February 15, 2006. (Am. Compl. (Civ. No. 3:06cv00017) ¶ 158.) Based on Plaintiff's past reimbursement requests, one day's mileage was worth, on average, around $32. (*See, e.g.*, Pl.'s Mot. Summ. J., Ex. 16 at RAWV-1000.) Even if Plaintiff were entitled to the $32, withholding it does not rise to the level of a materially adverse employment action. Moreover, Plaintiff concedes that he never submitted his mileage for that date and that Defendants have offered to pay him if he will do so. Rather than simply submit the mileage and collect the $32, Plaintiff has insisted on wasting both

---

[25] According to Linda Hall's notes of her conversation with the Staunton store manager, Plaintiff "complained" about the display by summarily unplugging it and then yelling at his co-workers until three of them were reduced to tears. (Hall Decl., Ex. F.)

the Court's and Defendants' time pursuing this frivolous retaliation claim. Because Defendants are entitled to summary judgment on the claim, Plaintiff will now likely get nothing.

### 9. Count Ten: "Retaliation by Keeping Plaintiff in a Hostile Environment"

Buried deep within his Amended Complaint is the crux of Plaintiff's hostility toward Defendants: "[t]he defendants retaliated against the plaintiff by refusing to remove the employees who harassed the plaintiff from the store." (Am. Compl. (Civ. No. 3:06cv00017) ¶ 162.) The record is replete with evidence that Defendants' refusal to give in to Plaintiff's demand that they fire Grier, Killen, and, in particular, James for their unwelcome comments is the single most significant source of Plaintiff's consternation. In short, Defendants' notices to Grier and James that they would be terminated if their conduct recurred were simply not good enough for Plaintiff. They are, however, good enough for this Court, which "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (quoting *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997)); *see also id.* at 298–99 ("Title VII is not a vehicle for substituting the judgment of a court for that of the employer.").

Furthermore, Plaintiff admits that much of the alleged racial harassment and virtually all of the alleged sexual harassment ceased after Defendants reprimanded his co-workers, and that he did not alert Defendants to any further instances (except for the incident with Killen in January 2006). (Verrinder Dep. 310:25–311:4, 325:1–10; Pl.'s Resp. Defs.' Mot. Summ. J. 7.) Under these circumstances, a reasonable employee would not have found Defendants' "refus[al]

– 32 –

to remove the employees . . . from the store" to be materially adverse. Accordingly, Defendants are entitled to summary judgment on this claim.

### 10. Count Eleven: "Retaliation by Reducing Technician Hours"

Plaintiff claims that "[t]he defendants retaliated against the plaintiff by reducing the number of technician hours available in the plaintiff's pharmacy while not reducing hours in other stores."[26] (Am. Compl. (Civ. No. 3:06cv00017) ¶ 166.) In his deposition testimony, Plaintiff clarified that his claim is that the total number of hours that the pharmacy technicians at Plaintiff's store were working was reduced so that, when on duty, Plaintiff had less support from technicians. (Verrinder Dep. 559:7–19.) Plaintiff admits, however, that he was still able to complete his duties, and he cannot rebut Defendants' evidence that any reduction in hours would have equally affected Plaintiff's partner-pharmacist, Brandy Pierce. (*Id.* at 559:17–560:18, 562:2–20; Owens Decl. ¶ 5.)

Furthermore, Plaintiff claims that the reduction in hours was carried out as follows: "They removed a technician from the store. And, um, I think Louise and Heather had some overtime before that, which I don't think they got anymore." (Verrinder Dep. 559:9–12.) Thus, to accept Plaintiff's claim, one must accept that Defendants either fired or transferred one technician, took away overtime from two others, and made Plaintiff's partner-pharmacist suffer along with him, just to make Plaintiff's job a little bit harder.[27] Given the absence of evidence to support this narcissistic interpretation of events, a reasonable employee in Plaintiff's situation would not find the reduction in technician hours to be a materially adverse employment action.

---

[26] Nowhere in his summary judgment-related filings does Plaintiff even address this claim. It appears, therefore, that Plaintiff has abandoned it.

[27] But not so much harder that he couldn't carry out his duties and therefore be fired for cause, even though his pretextual termination was supposedly Defendants' ultimate goal all along.

Case 3:06-cv-00024-NKM-BWC   Document 148   Filed 12/11/07   Page 33 of 49   Pageid#: 1925

In addition, Plaintiff fails to show, or even argue, that Defendants' proffered reason—that "[a]ny reduction in the scheduled hours of pharmacy technicians at the Staunton Rite Aid was made for financial or business reason, not to retaliate against Mr. Verrinder"—is pretextual. (Owens Decl. ¶ 5.) Accordingly, Defendants are entitled to summary judgment on this claim.

### 11. Count Twelve: "Retaliation by Falsely Reprimanding Plaintiff"

Plaintiff claims that Defendants retaliated against him by "falsely reprimanding the plaintiff by asserting that plaintiff violated H.I.P.P.A. by reporting the fact that James and Killen violated H.I.P.P.A." (Am. Compl. (Civ. No. 3:06cv00017) ¶ 170.) This claim refers to the Written Notice Defendants gave to Plaintiff because of his statement to Hall that a particular customer had AIDS and his alleged "here are your happy pills" comment to a co-worker.

Plaintiff's argument that the Written Notice is a materially adverse action relies on the unpublished Fourth Circuit case *Nye v. Roberts*, 145 Fed. Appx. 1 (4th Cir. 2005) (per curiam). In *Nye*, the court explained as follows:

> The district court reasoned that a reprimand or downgraded performance evaluation is not an adverse employment action absent some evidence that it was accompanied by some form of "practical consequence[ ]" concerning the plaintiff's employment.
> In this case, however, the evidence is such that a reasonable jury could find that, in the context of the Board's system of progressive discipline, the reprimand and performance evaluation resulted in a material change in Nye's employment status. . . .
> . . . .
> . . . [U]nder the Board's system of progressive discipline, Dr. Carmean's formal letter of reprimand and Nye's downgraded performance evaluation thrust Nye further along the discipline track and closer to termination.

*Id.* at 6 (citations omitted).

Defendants do not dispute that they too have a "system of progressive discipline." Moreover, their claim that the Notice did not "thrust [the plaintiff] further along the discipline

track and closer to termination" because Plaintiff "was required only to repeat computer-based training" (Defs. Resp. Pl.'s Mot. Summ. J. 23) ignores the fact that in the Notice, the sentence prior to the one referring to training states, "Please be advised that you must refrain from engaging in this behavior in the future or you will be subjected to discipline up to and including discharge." (Verrinder Dep., Ex. 18.) Although *Nye* is not binding precedent, 4th Cir. R. 32.1, it does offer persuasive support for Plaintiff's claim that the Written Notice is a materially adverse action.[28]

Assuming without deciding that the Written Notice is a materially adverse action, however, Plaintiff's retaliation claim must nonetheless fail because he cannot rebut the non-discriminatory reasons, set forth in the Notice itself and discussed in greater detail below, for issuing the Notice. Therefore, Defendants' are entitled to summary judgment on this claim.

### 12. Count Fourteen: "Retaliation by Threatening Plaintiff"

According to Plaintiff, Linda Hall retaliated against him for complaining to the EEOC "by threatening him with the following statement, 'Do you know what happens in a lawsuit? The lawyers will know everything about your life and it will come out in court. It won't be pretty.'" (Am. Compl. (Civ. No. 3:06cv00017) ¶ 180.)[29] Assuming for the moment that Hall did in fact make this statement, a reasonable employee would not have found it to be materially adverse. It merely restates what is fairly common knowledge, and as the instant lawsuit has amply demonstrated, Hall's statement was largely accurate. Indeed, it appears from the record that

---

[28] Defendants also argue that "Verrinder's sworn testimony is that he did not construe the final written warnings issued to Louise James and Tamar Grier to be adverse employment actions. It is incredulous for him to now claim that his Written Notice is an adverse employment action." (Defs.' Resp. Pl.'s Mot. Summ. J. 23 (citing Verrinder Dep. 323–24).) Plaintiff's inconsistent assessment of the various notices is indeed troubling, given that the notices issued to James and Grier advanced them equally as close to termination as Plaintiff's Notice. Under *White*,

Plaintiff voluntarily dismissed his claims for damages related to emotional distress in order to prevent the attorneys for Defendants from gaining access to his medical records. (*See* Tr. Telephonic Mots. Hr'g 19–23, Mar. 19, 2007; Pl.'s Mot. Voluntary Dismissal of Claims for Emotional Distress Damages 1.) Had he not done so, Hall's statement that "[t]he lawyers will know everything about your life and it will come out in court" would most likely have proven to be even more prophetic than it already has. Although a naive employee might find Hall's statement to be materially adverse, a reasonable one would not. Accordingly, Defendants are entitled to summary judgment on this claim.

## C. DEFAMATION PER SE

Plaintiff's Amended Complaint relating to his defamation claims lists fifteen counts of defamation per se.[30] (Am. Compl. (Civ. No. 3:06cv00024) ¶ 148–92.) These counts may be divided into two categories: those that relate to publication of alleged oral statements that "Bill violated HIPAA" and those that relate to publication of the Written Notice.[31]

---

however, the proper standard is objective, rather than subjective, *White*, 126 S. Ct. at 2415, and Defendants cite no authority suggesting that I may consider Plaintiff's subjective viewpoint in deciding the issue of material adversity.

[29] Plaintiff has not pursued this claim in any of his filings relating to the cross-motions for summary judgment.

[30] The Amended Complaint also includes one count of defamation, which I previously dismissed. (Order, Aug. 2, 2006.)

[31] In its entirety, the Written Notice given to Plaintiff reads as follows:

Subject: Written Notice

Via: Hand Delivery

To: William Verrinder, EE# [redacted]
From: Mark Owens, Linda H. Hall
Date: December 7, 2005

On September 22, 2005 you approached me [Linda Hall] and disclosed medical condition of patient/customer. Your comments were to me," Let me ask you something, just assume I was gay. This guy customer that asks if I was available has aids." I did not request this information nor did I need to know this information in course of the investigation. This information was not used for treatment, payment or health care operations. You also made statement to associate in your store when she came to pick up her prescription which you had filled. She claims you stated that she was picking

As I explained in my August 2, 2006 ruling on Defendants' Motion to Dismiss, defamation under Virginia law[32] requires (1) a publication about Plaintiff; (2) a false and defamatory statement; and (3) the requisite intent. (Mem. Op. 3, August 2, 2002.) In allowing Plaintiff to proceed on his defamation per se claims, I held that "the statements that Plaintiff violated HIPAA or disclosed patient information prejudiced him in his profession and are thus defamatory per se."[33] (*Id.* at 5.) In addition, there is no question that the alleged statements are about Plaintiff. Thus, the next logical step is to determine whether there is a genuine issue of material fact as to publication.

### 1. Publication

"Publication sufficient to sustain common-law defamation is uttering the slanderous words to some third person so as to be heard and understood by such person." *Thalhimer Bros. v. Shaw*, 159 S.E. 87, 90 (Va. 1931). Plaintiff's claims based on the alleged oral statements that

---

up her happy pills, as we discussed. Associate feels that this was violations of her privacy and that other associates and customers may have heard this statement. You had no safe guard to limit this incidental disclosure.

Rite Aid's policy is to protect medical information of patients, including associates. The federal HIPAA Privacy Regulation provides standards for that protections and Rite Aid conforms to those standards.

Please be advised that you must refrain from engaging in this behavior in the future or you will be subjected to discipline up to and including discharge. You must repeat the HIPAA training by December 31, 2005.

(Verrinder Dep., Ex. 18 (typographical errors in original).) The Notice is signed by Owens and Hall, as well as by Chris Watson, who was acting as a witness. (*Id.*) Handwritten notations indicate that Plaintiff refused to sign the Notice. (*Id.*) Below the signature area is typed the phrase "cc: Personnel File". (*Id.*)

[32] The parties agree that Virginia law controls Plaintiff's defamation per se claims.

[33] Because I was ruling on a Motion to Dismiss, this holding assumed the truth of the allegations in Plaintiff's Amended Complaint. The summary judgment standard, however, looks beyond the allegations of the complaint to test the sufficiency of the evidence. *See, e.g.*, Fed. R. Civ. P. 56(c). Plaintiff has apparently failed to appreciate this distinction, as well as the fact that this prior holding was addressed only to half of the second element of defamation (i.e., a defamatory statement). Plaintiff argues that "[t]he Court has already ruled that the written notice given to the Plaintiff qualifies as defamation per se. . . . The only relevant issue left in the defamation per se claims is whether

"Bill violated HIPAA" fail to satisfy the publication requirement because Plaintiff offers no evidence that anyone at any time said "Bill violated HIPAA," or words to that effect, to anyone other than Plaintiff. Indeed, Plaintiff effectively conceded as much in his deposition testimony (Verrinder Dep. 394:2–402:25, 414:3–418:13, 696:6–697:22), and he has not argued the issue in his summary judgment-related filings. Accordingly, Defendants are entitled to summary judgment on those claims.

As to the counts based on the Written Notice, Plaintiff claims that the Notice was improperly published by Linda Hall and/or Mark Owens[34] to the following Rite Aid employees: Chris Watson (District Manager), Mark Owens, (Pharmacy District Manager), Marilyn McClure-Demers (Employment Law Counsel), Kevin O'Brien (Regional Vice-President of Human Resources), Wayne LeClair (Vice-President of Human Resources), and Todd McCarty (President of Human Resources).[35] (Am. Compl. (Civ. No. 3:06cv00024) ¶¶ 6, 152.) In their summary judgment-related filings, Defendants admit that the Written Notice was published to Watson, Owens, and LeClair, but they deny publishing it to McClure-Demers, O'Brien, and McCarty. (Defs.' Br. Supp. Mot. Summ. J. 53, 57, 59–60.) In their Answer to Plaintiff's Amended Complaint, however, Defendants admit that McClure-Demers was sent a copy of the Notice and has read it, and I will assume without deciding that this admission constitutes an admission of publication to McClure-Demers.[36] (Answer (Civ. No. 3:06cv00024) ¶¶ 122–23.) As to O'Brien

---

Hall and Owens acted with malice." (Pl.'s Resp. Defs.' Mot. Summ. J. 25.) Although Plaintiff correctly identifies *one* remaining issue in his defamation per se claims, it is by no means the *only* remaining issue.

[34] Although Plaintiff's Amended Complaint alleges generally that the Written Notice was published by Linda Hall and Mark Owens (Am. Compl. (Civ. No. 3:06cv00024) ¶ 6), the individual counts relating to publication of the Notice specify publication by only Hall (*Id.* ¶¶ 149, 152, 155, 158, 161, 164, 173).

[35] The employment titles listed are those given by Plaintiff. For some of these individuals, Defendants state their titles differently. (*See* Defs.' Br. Supp. Mot. Summ. J. 53.)

[36] Paragraph 122 of Plaintiff's Amended Complaint states that "Hall or Owens sent to McClure-Demers a copy of the written notice . . . ." (Am. Compl.(Civ. No. 3:06cv00024) ¶ 122.) In their somewhat ambiguous response, Defendants' state that "Ms. McClure-Demers was sent a copy of Plaintiff's Written Notice. Except as expressly

and McCarty, Plaintiff offers no evidence that either was ever sent the Written Notice by anyone other than Plaintiff himself. Thus, Plaintiff's claims arising out of publication of the Notice to O'Brien and McCarty fail for lack of publication, and Defendants are entitled to summary judgment on those claims.

### 2. Qualified Privilege

Though admitting publication to Watson, Owens, LeClair, and McClure-Demers, Defendants argue that these individuals are entitled to a qualified privilege.[37] "Communications between persons on a subject in which the persons have an interest or duty are occasions of privilege."[38] *Larimore v. Blaylock*, 528 S.E.2d 119, 122 (Va. 2000). This privilege is qualified, rather than absolute, because it will be defeated if "a showing of malice is made by clear and convincing evidence." *Id.* at 123. However, "employment matters are occasions of privilege in which the absence of malice is presumed." *Id.* at 122. Absent a showing of sufficient malice by

---

admitted herein, Defendant denies the allegations set forth in Paragraph 122 . . . ." (Answer (Civ. No. 3:06cv00024) ¶ 122.)

[37] It is unclear under Virginia law whether a qualified privilege merely negates the publication element or is itself a separate and distinct defense to defamation. *Compare Larimore v. Blaylock*, 528 S.E.2d 119, 122 (Va. 2000) (citing cases where the issue "was whether the privileged occasion was lost because communication of the statement to such an employee constituted communication or publication to a third party"), *and Shaw*, 159 S.E. at 89–90 (citing cases for the proposition that a communication to a privileged person is not a publication), *with Larimore*, 528 S.E.2d at 123 (holding that recipients of a communication "were entitled to a qualified privilege which shields the defendants form liability unless a showing of malice is made by clear and convincing evidence"), *and Great Coastal Express, Inc. v. Ellington*, 334 S.E.2d 846, 853 (Va. 1985) (treating qualified privilege as a distinct defense). Regardless, the cases are unanimous in holding that when there is a qualified privilege that is not defeated by a clear and convincing showing of malice, liability for defamation cannot attach. *See, e.g., Larimore*, 528 S.E.2d at 123; *Ellington*, 334 S.E.2d at 853–54; *Shaw*, 159 S.E. at 89–90.

[38] The rationale for providing a qualified privilege in the employment context is stated as follows:

> Public policy and the interest of society demand that in cases such as this an employer, or his proper representatives, be permitted to discuss freely with an employee, or his chosen representatives, charges affecting his employment which have been made against the employee to the employer. There is a privilege on such occasions and a communication made under such circumstances, within the scope of the privilege, without malice in fact, is not actionable, even though the imputation be false, or founded upon erroneous information.

*Chesapeake Ferry Co. v. Hudgins*, 155 Va. 874, 156 S.E. 429, 441 (1931).

Case 3:06-cv-00024-NKM-BWC   Document 148   Filed 12/11/07   Page 39 of 49   Pageid#: 1931

clear and convincing evidence, the privilege "shields the defendants from liability." *Id.* at 123.

"Only the court can determine whether this privilege exists." *Swengler v. ITT Corp.*, 993 F.2d

1063, 1072 (4th Cir. 1993) (citing *Great Coastal Express, Inc. v. Ellington*, 334 S.E.2d 846, 853

(Va. 1985)).

     Of the four employees to whom the Notice was published, I previously held on the basis

of the pleadings that only Watson was not entitled to a qualified privilege because "[t]he

Amended Complaint discloses that all the other recipients of the information had some interest in

it." (Mem. Op. 6–7, August 2, 2002.) Now, upon consideration of the undisputed evidence put

forth by the parties, I find that Watson is also entitled to a qualified privilege. As District

Manager, he had a duty and interest in disciplinary and personnel matters involving all

employees at stores under his supervision, which included Plaintiff's store. (Owens Dep. 6:8–

7:23; Watson Dep. 30:20–31:19.) In addition, Plaintiff had previously "insisted on reporting any

and all allegations or problems . . . to Chris Watson, . . . as opposed to Mark Owens or Linda

Hall" and had "specifically asked that Chris Watson be put into the loop . . ." (Verrinder Dep.

409:9–23.) Although Plaintiff may have changed his mind regarding Watson's involvement

shortly before he was issued the Written Notice (*id.* at 409:25–410:6), Watson's interest need not

have immediately evaporated. Finally, Owens has testified that he, Watson, and Hall were

"partners" (Owens Dep. 106:25–107:3), and the Notice was published to Watson in connection

with his acting as a witness to Hall and Owens's presentation of it to Plaintiff (Verrinder Dep.,

Ex. 18; Am. Compl. (Civ. No. 3:06cv00024) ¶ 7); *cf. Larimore*, 528 S.E.2d at 122–23

("[C]ommunication of . . . statements to an employee required to transcribe or transmit the

communication containing the defamatory statements is not a publication to a third party which

would cause the loss of the privilege.").

Having found that Watson, Owens, LeClair, and McClure-Demers are entitled to a qualified privilege, it remains to consider whether a reasonable jury could find by clear and convincing evidence that Hall and Owens communicated the Written Notice with sufficient malice to overcome the privilege.[39] The level of malice required to defeat a qualified privilege is "common-law malice." *Great Coastal Express, Inc. v. Ellington*, 334 S.E.2d 846, 854 (Va. 1985).

> Common-law malice is defined as "some sinister or corrupt motive such as hatred, revenge, personal spite, ill will, or desire to injure the plaintiff; or what, as a matter of law, is equivalent to malice, that the communication was made with such gross indifference and recklessness as to amount to a wanton or willful disregard of the rights of the plaintiff."

*Id.* at 851 n.3 (quoting *Preston v. Land*, 255 S.E.2d 509, 511 (Va. 1979)).[40]

Under *Ellington*, "common-law malice may be shown, sufficient to defeat a qualified privilege," in a number of ways. *See id.* at 853–54. One such method is by clear and convincing "proof that the speaker uttered defamatory words without believing them to be true, or lacked

---

[39] "When, as here, the non-moving party must produce clear and convincing evidence to support its claim, that higher evidentiary burden is considered as part of the summary judgment calculus." *Wells v. Liddy*, 186 F.3d 505, 520 (4th Cir. 1999) (citing *Anderson*, 477 U.S. at 244). Accordingly, "where the . . . 'clear and convincing' evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Anderson*, 477 U.S. at 244.

[40] One of the primary focuses of *Ellington* is the distinction in defamation law between common-law malice and so-called *New York Times* malice, the latter being shown by a defendant's knowledge or reckless disregard of falsity. *See Ellington*, 334 S.E.2d at 851 n.3, 853–55. "Not wishing to further complicate a branch of the law already sufficiently vexed by two competing species of malice," the *Ellington* court took pains to avoid the ambiguous term "actual malice," which the U.S. Supreme Court had used to describe *New York Times* malice, but which other courts, including the Virginia Supreme Court, had often used to describe common-law malice. *Id.* at 851 n.3 (citing *New York Times v. Sullivan*, 376 U.S. 254, 280 (1964); *Preston v. Land*, 220 Va. 118, 120 (1979)); *see also Richmond Newspapers, Inc. v. Lipscomb*, 362 S.E.2d 32, 35 (Va. 1987) ("'Actual malice' as described in *New York Times* might be confused with common law malice, which involves 'motives of personal spite, or ill-will.' Therefore, we will refer to such actual malice as '*New York Times*' malice."). This laudable effort toward clarity, however, does not appear to have made a lasting impact, with more recent Virginia decisions frequently referring to common-law malice as "actual malice." For example, in *Union of Needletrades v. Jones*, 603 S.E.2d 920 (Va. 2004), the court stated that "actual malice" must be established in order to defeat a qualified privilege and quoted, as the definition of "actual malice," language from *Gazette, Inc. v. Harris*, 325 S.E.2d 713, 727 (Va. 1985), which was used in *Gazette* to define "common-law malice." *Union of Needletrades*, 603 S.E.2d at 924 (quoting *Gazette*, 325 S.E.2d at 727).

reasonable or probable grounds for believing them to be true."[41]  *Id.* at 854 (citing *Montgomery Ward v. Nance*, 182 S.E. 264, 272 (Va. 1935); *Chesapeake Ferry Co. v. Hudgins*, 156 S.E. 429, 441 (Va. 1931); *Aylor v. Gibbs*, 129 S.E. 696, 699 (Va. 1925)).  Consistent with this principle, Plaintiff argues that Owens and Hall's communication of the Written Notice was malicious because they knew or should have known that the statements in the Notice were false.[42]  (Pl.'s Mot. Summ. J. 13–14; Pl.'s Resp. Defs.' Mot. Summ. J. 25, 27; Pl.'s Resp. Defs.' Resp. Opp'n Pl.'s Mot. Summ. J. 9–10.)  However, Plaintiff offers no evidence that Hall and Owens had actual knowledge that the statements were false or that they did not subjectively believe them to

---

[41] Defendants ignore this unequivocal statement in *Ellington*, arguing instead that under *Union of Needletrades*, Plaintiff should be held to a higher standard.  (Defs.' Reply Supp. Mot. Summ. J. 28; *see also* Defs.' Resp. Opp'n Pl.'s Mot. Summ. J. 26–27.)  The court decided the defamation issue in *Union of Needletrades* not on the basis of a qualified privilege, but rather solely on the Plaintiff's failure to meet his burden of proving the falsity of the statements.  *See Union of Needletrades*, 603 S.E.2d at 924–26.  In dicta, however, the court briefly addressed the standard for common-law malice (referred to in *Union of Needletrades* as "actual malice").  *Id.* at 924.  As it is explained in the text of the opinion, the standard in *Union of Needletrades* is wholly consistent with *Ellington*.  *Id.*  But in a footnote, the court cited *Ellington* for the proposition that "[w]ithin the context of defamation law, there is also an intermediate standard between simple negligence and actual malice, sometimes referred to as 'New York Times malice,' wherein the plaintiff need show only that the statement was made with knowledge that it was false or with a reckless disregard for the truth . . . ."  *Id.* at 924 n.4 (citing *N.Y. Times*, 376 U.S. at 280; *Ellington*, 334 S.E.2d at 851).  Apparently, the court understood *Ellington* to hold that common-law malice is a higher standard than even *New York Times* malice, when *Ellington* in fact held the precise opposite.  *See Ellington*, 334 S.E.2d at 851 n.3, 854.  If the *Union of Needletrades* interpretation of *Ellington* is correct, then the common-law malice standard sets an exceptionally high bar: not only would proof that a defendant "lacked reasonable or probable grounds for believing [a statement] to be true" be insufficient, but even proof that a defendant made a statement with reckless disregard for the truth would not be enough.  *Ellington*, to the contrary, plainly states that *either* is sufficient to defeat a qualified privilege.  *Id.* at 854.  Indeed, the court in *Ellington* explicitly rejected the proposition "that only proof of *New York Times* malice"—much less something more than *New York Times* malice—"will suffice."  *Id.*

Regrettably, in *Conley v. Town of Elkton*, 190 Fed. Appx. 246 (4th Cir. 2006) (unpublished opinion), the Fourth Circuit, without addressing *Ellington*, tacitly endorsed the *Union of Needletrades* footnote as a correct statement of Virginia law, citing it for the proposition that even proof of *New York Times* malice would not allow the plaintiff in *Conley* to overcome a qualified privilege.  *Id.* at 254 n.7 (citing *Union of Needletrades*, 603 S.E.2d at 924 n. 4).  Of course, the Virginia Supreme Court may modify or overrule its case law as it sees fit—and federal courts applying Virginia law must accept those decisions—but that does not appear to have been the court's intent in *Union of Needletrades*.  Moreover, because the *Union of Needletrades* footnote is clearly dicta, and *Conley* is an unpublished opinion, neither is binding precedent.  Given that *Ellington* remains good law in Virginia, and that its definition of common-law malice, including the "lacked reasonable or probable grounds" standard for showing such malice, is clear, unequivocal, and the most favorable to Plaintiff, I decline to apply the *Union of Needletrades* dicta to Plaintiff's claims and will instead apply the *Ellington* standard.

[42] Plaintiff does not appear to argue, and certainly offers no evidence, for the existence of common-law malice on some other acceptable basis, such as clear and convincing proof that Hall and Owens "[d]eliberately adopted a method of speaking the alleged words which gave unnecessary publicity to such words," or that they published the

be true. Rather, Plaintiff's evidence goes only to whether they should have known the statements were false or, in the language of *Ellington*, "lacked reasonable or probable grounds for believing them to be true."

In this vein, Plaintiff places great emphasis on the claim that Hall and Owens had access to Rite Aid's HIPAA training and policy materials, that those materials forbid only disclosure outside of the company, and that therefore they should have known that no disclosure to fellow Rite Aid employees can violate HIPAA. (*See* Pl.'s Mot. Summ. J. 13–14; Pl.'s Resp. Defs.' Mot. Summ. J. 25, 27; Pl.'s Resp. Defs.' Resp. Opp'n Pl.'s Mot. Summ. J. 8–9.) Plaintiff is correct that Rite Aid's *HIPAA Procedures* manual defines the term "disclosure" as "[t]he release, transfer, provision of access to, or divulging in any other manner of Protected Health Information [(PHI)] outside Rite Aid."[43] (Pl.'s Mot. Summ. J., Ex. 21 at 21); *cf.* 45 C.F.R. § 160.103 ("Disclosure means the release, transfer, provision of, access to, or divulging in any other manner of information outside the entity holding the information."). The only use of the word "disclosure" in the Written Notice, however, is in the statement that Plaintiff "had no safe guard to limit this incidental disclosure," which immediately follows the statement that the co-worker to whom Plaintiff made the "happy pills" remark felt "that other associates and customers may have heard this statement." (Verrinder Dep., Ex. 18.)

---

Written Notice "[f]or the purpose of gratifying some sinister or corrupt motive such as . . . personal spite, [or] ill will." *Ellington*, 334 S.E.2d at 853.

[43] To the extent relevant to this case, PHI is "[i]ndividually identifiable health information . . . that is . . . . [t]ransmitted or maintained in any . . . form or medium." (Pl.'s Mot. Summ. J., Ex. 21 at RAWV-0870); 45 C.F.R. § 160.103. "Individually identifiable health information" includes "[i]nformation that . . . (1) [i]s created or received by a health care provider[, including pharmacies] . . . ; and (2) [r]elates to the past, present, or future physical or mental health or condition of an individual; . . . and . . . [w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." (Pl.'s Mot. Summ. J., Ex. 21 at RAWV-0867); 45 C.F.R. § 160.103. Under many circumstances, a statement that "this guy . . . has AIDS" would probably not contain individually identifiable health information because it does not identify "this guy." But under the circumstances of Plaintiff's statement—namely, the investigation of his complaints of harassment—there was "a reasonable basis to believe" that Hall had or would have learned the customer's name in the course of her investigation and therefore "to

Rite Aid's *HIPAA Procedures* manual describes an "incidental disclosure" as "one that happens as a result of ('incidental to') an otherwise allowable disclosure. The disclosure to the patient is allowable, the disclosure to surrounding [patients or customers] is not allowable, but is incidental to the allowable one." (Pl.'s Mot. Summ. J., Ex. 21 at 18.) The manual further states that "Rite Aid pharmacies have a legal obligation to use 'reasonable safeguards' to limit the amount of PHI disclosed in incidental disclosures." (*Id.*) As examples of such safeguards, it suggests "ask[ing] other individuals to step back a few feet" and to speak "in a soft voice," or "mov[ing], with the patient, to another area of the store, away from other customers." (*Id.*) In the same context, the manual also notes that "inappropriate and unnecessary comments on patients' medications and conditions should not occur. Comments such as, 'Mrs. Jones sure takes a lot of Vicodin,' are the subject of many complaints because people who were not part of the pharmacy staff overheard them. Conversations about patients' health should always be conducted in a professional manner." (*Id.*)

With this background in mind, it becomes clear that the statement in the Written Notice that Plaintiff "had no safe guard to limit this incidental disclosure" refers to a failure to take precautions to prevent others, including non-employees, from hearing his "happy pills" remark. Plaintiff's argument that there can be no disclosure to Rite Aid employees is therefore irrelevant to the Notice's use of the term "disclosure," which is wholly consistent with HIPAA regulations. Moreover Plaintiff has failed to put forth evidence showing a genuine issue as to Owens and Hall's reasonable or probable grounds for believing the statements regarding incidental disclosure to be true. Indeed, the only evidence Plaintiff offers on this point is Heather Killen's statement that she did not remember hearing Plaintiff refer to anyone's medication as "happy

believe the information [could] be used to identify the individual." As a result, Plaintiff's statement did contain

pills" (Hall Decl., Ex. E), and Plaintiff's own sworn statement—made in a Declaration in which he also accuses Killen of "having a history of lying"[44]—that "Plaintiff did not ever give [the co-worker] medication with others around."[45] (Pl.'s Resp. Defs.' Mot. Summ. J., Ex. 2 at 2, 4).

Whether this evidence might create a triable issue as to the actual truth of the statements in the Notice is questionable. No reasonable jury could find, however, that it amounts to clear and convincing evidence that Hall and Owens lacked reasonable grounds for believing the statements were true, especially given that their grounds included the co-worker's complaint, the fact that the co-worker subsequently changed her prescriptions to another store (Hall Decl., Ex. C), and Killen's statement that, although she had not heard the "happy pills" remark, she had heard Plaintiff make a different inappropriate comment regarding the co-worker's medication (Hall Decl., Ex. E). Accordingly, Plaintiff has failed to overcome the qualified privilege with respect to the statements in the Written Notice dealing with his "happy pills" remark.

Plaintiff also attempts to apply the HIPAA definition of "disclosure" to the statements regarding his comment that a particular customer has AIDS. Although the Notice does not use the word "disclosure" in this context, it does state that Plaintiff approached Hall "and *disclosed* [the] medical condition of [a] patient/customer." (Verrinder Dep., Ex. 18 (emphasis added).) Certainly this choice of words was unfortunate and is at least somewhat misleading. But the fact that a "disclosure," in the technical sense, was impossible under the circumstances, does not mean that Hall and Owens lacked a reasonable basis to believe that Plaintiff "disclosed [the] medical condition."

---

individually identifiable health information, and therefore contained PHI.
[44] This "history" apparently consists of Killen's claim that she has a mentally retarded sister, whom Plaintiff has somehow divined "does not exist." (Pl.'s Resp. Defs.' Mot. Summ. J., Ex. 2 at 2–3.)
[45] Plaintiff does not state in his Declaration or offer other evidence that he ever informed Hall or Owens of this.

First, although communicating the nature of the customer's illness to Hall was not,

technically, a "disclosure" of PHI, it was most certainly a "use" of PHI. "Use" is defined by the

HIPAA regulations and by Rite Aid as "the sharing, employment, application, utilization,

examination, or analysis of such information within an entity that maintains such information."

(Pl.'s Mot. Summ. J., Ex. 21 at RAWV-0873); 45 C.F.R. § 160.103. To the extent relevant to

this case, the only practical distinction between "use" and "disclosure" is the recipient of the

communicated health information: if the recipient is not a Rite Aid employee, the communication

is a "disclosure"; if the recipient is a Rite Aid employee, it is a "use." (*See, e.g.*, Pl.'s Mot.

Summ. J., Ex. 21 at RAWV-0850 (making no distinction between incidental uses and incidental

disclosures).)

Second, a notice stating that Plaintiff approached Hall and "used" the medical condition

of a customer, though technically correct, would be far less clear and understandable than the

Written Notice's use of the term "disclosed." Third, the Notice utilizes the correct term later in

the same paragraph, when it states, "This information was not *used* for treatment payment or

health care operations." (Verrinder Dep., Ex. 18 (emphasis added).) Given these facts, no

reasonable jury could find by clear and convincing evidence that Hall and Owens lacked

reasonable grounds for believing the truth of the statement simply because a "disclosure" to Hall

was technically not possible.

As mentioned, however, the Written Notice also states that the PHI regarding the

customer's medical condition "was not used for treatment, payment, or health care operations."

(Verrinder Dep., Ex. 18.) HIPAA regulations and Rite Aid policy "require[] each associate to

use or disclose [PHI] only for purposes that the HIPAA regulation permits or requires." (Pl.'s

Mot. Summ. J., Ex. 21 at RAWV-0846); *see also* 45 C.F.R. § 164.506. The primary permitted

uses are for "treatment, payment, or health care operations." (Pl.'s Mot. Summ. J., Ex. 21 at RAWV-0882); 45 C.F.R. §§ 164.502(a)(1)(ii), 164.506(a), (c). Thus, by stating that the customer's PHI "was not used for treatment, payment, or health care operations," the Written Notice implies that Plaintiff's use of the PHI violated HIPAA regulations and Rite Aid policy.

But as Plaintiff correctly suggests, HIPAA regulations define "health care operations" to include "[b]usiness management and general administrative activities of the entity, including . . . [r]esolution of internal grievances." 45 C.F.R. § 164.501(6)(iii); (see also Pl.'s Resp. Defs.' Resp. Opp'n Pl.'s Mot. Summ. J. 9; Pl.'s Resp. Defs.' Mot. Summ. J. 27.) This raises the question of whether Hall and Owens had reasonable or probable grounds for believing that Plaintiff's use of PHI was not related to the resolution of an internal grievance.[46]

Plaintiff does not dispute that his complaints of sexual and racial harassment were the reason for Hall's investigation at the Staunton store, and he concedes that his statement to Hall that "this guy customer . . . has AIDS" was not relevant to those complaints. (Verrinder Dep. 359:21–361:12, 365:14–18; Pl.'s Resp. Defs.' Resp. Opp'n Pl.'s Mot. Summ. J. 8.) Instead, Plaintiff asserts that his statement was related to a separate complaint:

> The fact that the customer allegedly has AIDS is relevant to the Plaintiff's complaint of *general harassment* by Louise James against the Plaintiff. Just because it is not related to a Title VII claim does not make it somehow unallowable to complain to Linda Hall that Louise James thinks it is hilarious that someone with AIDS wanted to know if the Plaintiff was available.

(Pl.'s Resp. Defs.' Resp. Opp'n Pl.'s Mot. Summ. J. 8 (emphasis added).) Yet Plaintiff does not point to, and I have not discovered, any record evidence that Plaintiff had ever complained of "general harassment" by anyone.

_____

[46] The parties have not cited, and I have not discovered, any case law or legislative history defining in greater detail what activities and circumstances would constitute "resolution of internal grievances."

Instead, the undisputed evidence is that Plaintiff's complaints were limited to his allegations of sexual and racial harassment and his allegation that the Staunton store manager had discouraged him from reporting the alleged harassment. (*See, e.g.*, Verrinder Dep., Exs. 7–9; Hall Dep., Ex. 23.) As a result, no reasonable jury could find by clear and convincing evidence that Hall and Owens lacked reasonable grounds for believing (1) that Plaintiff's statement was not related to the resolution of an internal grievance; (2) that it was therefore not a use of PHI for health care operations; and (3) that the use of PHI had therefore violated HIPAA regulations and Rite Aid policy.

For all these reasons, Plaintiff cannot show by clear and convincing evidence that Hall and Owens communicated the statements in the Written Notice with common-law malice. As a result, he cannot defeat the qualified privilege attached to Watson, Owens, LeClair, and McClure-Demers. Defendants are therefore entitled to summary judgment on Plaintiff's defamation claims arising out of publication of the Written Notice to those individuals, and I need not address the remaining elements of falsity and intent.

## IV. CONCLUSION

For the above-stated reasons, I previously granted Defendants' Motion for Summary Judgment with respect to all claims. Therefore, in a Judgment Order to follow, I will enter judgment in favor of Defendants, dismiss Plaintiff's case with prejudice, and direct the Clerk of the Court to strike this case from the Court's docket.

It is so ORDERED.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion to all counsel of record.

ENTERED: _Norman K. Moon_
United States District Judge

_December 11, 2007_
Date